Could we do likewise, Your Honor? Could we do likewise? Yes. Thank you, Mr. Walker. We'll help. Be strong. Okay, the next argued case is No. 15-1498. Homedica Osteonics Corporation v. Zimmer is the remaining party? Yes, Your Honor, that's correct. Okay, thank you. May it please the Court, Today I'll focus on one issue, the proper legal standard for proof of anticipation by inherency, leaving the other two issues to our briefs. For half a century, from In re Brink in 1970 to the present, this Court and its predecessor have applied a rigorous legal standard for anticipation by inherency. That rigorous legal standard requires proof that the missing claim element, missing from the reference, was necessarily present in the prior reference. Possibly present and even probably present are legally insufficient as a matter of law. The Board's decision in this case misapplied this legal and controlling standard. Instead, the Board held, and I quote, it's only necessary to, quote, take reasonable steps to find a similar material to that available at the time of the reference. Note, reasonably, reasonable, not necessarily successful, similar, not substantially identical, and available, not necessarily disclosed in the reference. What do you think is required? There's no such thing as complete certainty in this world. So what level of certainty do you think is required in this setting, for example, to determine that the substance that was used by Lou was in fact the same substance or one of the two substances that was used by Dr. Clough, is it, or Clough? I believe it's Clough, although I've said Clough, so let's go with Clough. It'll be Clough then, I guess. In this case, where there are options, Your Honor. Well, but what's the standard? What's the test that we should be applying? You say it's not reasonable steps, but what is it? Not possible and not probable, but necessarily present. Well, but we know it's not. I mean, there's going to be some room for doubt, no matter how conclusive the testimony, even if Mr. Cattivo had said, I'm absolutely certain I remember Mr. Lou came in, I'm absolutely certain I gave him either 4130 or 4030. One could argue, what does he remember that far back? We're not absolutely certain. So absolute certainty can't be the requirement. What do you think is the requirement? I would say something close to it, and where you have options, where there are defined options that were, quote, are the one that was, in fact, reported in the reference, then there's no inherency. And it's a tough standard, but it's a rather rare defense because what we're talking about is a reference that has a missing piece already. It's got a missing claim element. So where are you going to build that in? In this case, we've got two problems. The first one is that we're not dealing with the conventional details of a chemical compound, as, for example, was the case of Spada, which they rely on, and which was determined because they were disclosed in writing monomers identical to those in the patent. We're not dealing with that. We're dealing with ultra-high molecular weight polyethylene, which we know from Lou the reference itself is dramatically different depending on what happened to it. And here we've got five different options of what that ultra-high might have been. It might have been ultra-high without modification. It might have been ultra-high with PTFE fillers. It might have been ultra-high with carbon fillers. It might have been ultra-high with, as Kativo said, quote, other things in it. But didn't they cross that bridge in terms of narrowing the parameters, the description of the product that they obtained? Forgive me, Your Honor, I didn't understand the question. Well, you're saying it might have had fillers, it might have had this and that. I don't recall that variability being raised in the product or being appropriately there in terms of that which they obtained from the producer. That's the problem, Your Honor. It was identified by Kativo, who was the only person they brought to testify what was the ultra-high material at the time that Lew obtained the material from a company called Dixon. Dixon had gone out of business. There was another company by another name that Kativo had worked for or was involved with. And then Kativo himself admitted literally no personal knowledge of what was manufactured at the time of Lew. So Lew's reference is missing a reference type, a reference grade, a reference number, or any other qualifications. And then the additional extrinsic evidence, which Robertson has said must show necessary presence. The extrinsic evidence, as Kativo is saying, I really don't recall much, but I know there were at least five alternatives of ultra-high available at Dixon, which were these five that I've already listed. And we don't know which of those five were reported by Lew. And certainly Dr. Clough, who relied on Kativo's rather fragile recollection, didn't know either. So we've got that major problem. And those five alternatives alone, in view of the case law, doom inherency as a matter of law. And this Court has gone for time and time again, reversed this kind of reliance of inherency. In Brink, there was a material that was available at the time, but because it wasn't shown to be necessarily present in the reference, the CCPA reversed the board determination. In Finnegan, this Court reversed the ITC inherency determination, where the claimed element was only one of two possibilities, let alone five, resonance or non, reversal of the ITC. In Inouye-Gifrida, not for publication but cited, this Court reversed again the PTAB inherency determination, where the claimed element was one of two portable or not, not sufficient as a matter of law. And then in Robertson, the Court did the same thing, reversed inherency of the PTAB and stated something I think is pertinent. The board's analysis, this is a quote but it applies to this case, the board's analysis rests on the very kind of probability or possibility that this Court has pointed out was insufficient to establish inherency. So on that basis alone, I would suggest that inherency fails as a matter of law and the decision should be reversed. But we've got other problems as well with the report, and I should note that Lew himself recognized it's very difficult, this is in writing in the reference,  because it may vary with material. That's Appendix 125. And also he reported having two different materials. We don't know what they were, and it wasn't the numbers. He reported no numbers. And he said these two different materials that he had were different in structure and different in behavior, and he couldn't explain the difference. He had no explanation. So Clough's test went on to first start out with a material 30 years later, which the evidence fails to show was in fact the one reported by Lew. But then he used six different deviations from the process reported by Lew, and the deviations were switch from small to commercial radiation unit, doubling radiation time, varying the radiation temperature by 60 degrees, varying the dosage rate, varying the total dosage, and adding heat-absorbing glass containers. Those six deviations also doom the inherency finding of this board. And as the case of Glaxo versus Apotex in 2004 tells us, that variations in the recreation, in an attempted recreation of prior art, doom inherency. And I might say there's good policy reason for why recreations ought to be subjected to the absolute identical test. They're not relying on the disclosure of the reference itself. They're relying on extrinsic evidence about what might that reference have taught if it had been built in the test. So we've got two problems. One is we don't know what the report of the ultra-high was in Lew. And number two, we've got these six deviations. And I might say Lew himself concluded that his product turned yellow, whereas Klaus did not after irradiation. So we know there's a physical difference. Lew reported that his product had severe degradation in wear fatigue and tensile strength. Both those reports are consistent with oxidation. Klaus made no report on those particular properties. But his conclusion of no oxidation is directly at odds with the Lew report, yet another hole in the inherency proofs. And the argument that a single case in re spada changed 50 years of this court's precedent holds no water. Both before and after spada, the necessarily present standard has been applied. And spada involved a unique fact pattern which involved identical monomers comparing a written disclosure in the prior art to a written patent and identical monomers disclosed in the prior art as were described later in the patent. It was that that dictated in re spada. Here, on the contrary, there are no identical chemical structures to Lew's description. And the record's completely silent as to the type of ultra-high that was used. There was some discussion, I guess, before the board about the problems that you have alluded to with respect to the irradiation, the difference in the devices used and so forth. But that all seemed to get resolved, and I think Lew says something to this effect, with the proposition that what really matters when you're talking about the radiation is the total dose. It doesn't matter how you get there. What matters is where you end up. I mean, if that's true, that sort of takes care of a number of your deviations, it seems to me, doesn't it? It certainly doesn't take care of the glass containers. It doesn't take care of the radical difference in 60-degree temperature variation during the irradiation. So no, it doesn't solve the problem. Why would the temperature difference during radiation matter? Well, as Lew says, minor variations in the process of irradiation have major implications. That's in Lew says at 8.125, very difficult to predict the effects of irradiation on a polymer. And also at 93, appendix 93, Lew reports small chemical changes from moderate radiation can cause large changes in physical properties. But that's a different issue. That's saying that different total amounts of radiation can produce unpredictable results. Fine. But that doesn't say that different ways of getting to that total amount of radiation have different effects, right? But I think that, for example, the glass container heating and the temperature variations are both factors that raise unknown results in the changes. If I could, I'd like to reserve my remaining time for rebuttal. Yes, indeed. Thank you, Mr. Malloy. Mr. Callahan. Good morning, Your Honors. May it please the Court, let me start by taking on the issue of inherency, which is what my colleague addressed. First, there was an extensive factual record. It would be unlikely to see one as factually developed because we were running in parallel with the district court litigation, which is why there are expert reports referenced, depositions of both experts and non-experts. There is an extensive factual record. Both the examiner and the PTAB considered that factual record and made factual findings that this court looks at for substantial evidence. So what we're looking for is, is there substantial evidence to support the Board's factual determinations that the inherency in lieu was shown? At the end of the day, we frequently see in the cases, the PTAB looks only at the reference itself and says, I see that you're using the same process. I assume you will reach the same results, and puts the burden back on to the patent owner. But how do you get around, for instance, the discoloration as a clear and conspicuous example of difference? So that's maybe a different genre, but it doesn't have any distinction. And let me walk you through why the type of resin, because all the arguments they're making really go to, did you get the right resin? And there are multiple reasons why in the record. The Board correctly determined as a factual matter that the type of ultra-high resin you use doesn't matter. First, the Board points out that the 020 patent and all of the prior art references talk about its teachings being widely applicable to ultra-high and other kinds of polyethylenes and other kinds of polymers. Second... Well, that may go to the breadth of the claim. That's right. And the claims talk about ultra-high molecular weight polyethylene, but with a special and much broader definition. The Board said most ultra-high molecular weight polyethylene, a million and a half to two million molecular weight, but Halmetica has a special definition of only 400,000. So its definition of ultra-high molecular weight polyethylene is much broader than what these references are talking about. They're talking about a narrow subset of that. So we don't have the situation that we have in all the in-ray cases where you have a narrow claim limitation, and this court has found in some instances that a broad disclosure that may or may not include that narrower limitation does not do inherency. Here we've got the opposite situation. Also, Your Honor, in the intrinsic record, the only way, Your Honor, that the patent owner got these claims in the first place was to utilize the general rule and do testing of the Stryker reference. When Halmetica tested the Stryker reference to say to the Patent Office, this is not anticipatory, they didn't use the resin disclosed in Stryker. And so for all these reasons, when you got to the examiner and the board having repeatedly factually considered these highly fact-intensive arguments and rejected them, it concluded at the board's final hearing where the board asked a very specific question of the patent owner. Is there anything in the record here, is there anything in the record that suggests that the type of resin makes a difference? And Halmetica admitted, this is at A2496, which is the transcript of that hearing, that it doesn't matter, lines 10 through 11, that they don't have anything in the record that demonstrates that the type of resin you start with makes any difference with respect to the claimed properties here. And that, Your Honors, is the reason, the principal reason, why this court ought to affirm the highly fact-intensive decision of the PTAB that Lew necessarily and always discloses a material that has all of the characteristics, all of the claimed characteristics of Claims 1 through 6. Now, we're also cross-appealing their determination, the board's determination that Claims 7 through 12 were not invalid, as the examiner found. And this court may wonder, because we're holding a summary judgment of non-infringement of Claims 7 through 12, does this really matter? The answer to that question is, yes, it very much matters. Because that decision is based on the district court's holding that the claim term is limited, the claim term annealed at a temperature greater than 25 degrees C means between 25 and below the melting temperature. And in that argument, Helmetica argued exactly the opposite of what they're now saying. They're now saying that is the right limitation, and they're using that to dismiss Lew, which is an hour at 150 degrees. But below, they said that term was not limited. And if that term isn't limited, if annealed at a temperature greater than 25 C means just greater than 25 C with no upper limit, well, then Lew anticipates for exactly the same reason that it anticipates Claims 1 through 6. Is this patent expired? It is expired, Your Honor. It expired in June of 2013. So what is the... You said you're holding a summary judgment of non-infringement. Which has not yet been appealed at this court, Your Honor. So our concern is that Helmetica would succeed in telling you that Lew doesn't anticipate because it's too high a temperature. And then they would come back to this court and say that Zimmer, whose product is made at 150 degrees, the same as Lew, does infringe. That's the argument they made below, both as a matter of claim interpretation, that the claim has no upper temperature limit, and if the claim does have an upper temperature limit of 140 degrees or less, that a product made at 150 degrees C, just like Lew... Wouldn't you be likely to wave their blue brief at them if they made such an argument? Well, but they're making the argument under the doctrine of equivalence as well, Your Honor. And these claims are invalid. They add nothing to claims 1 through 6 other than this process limitation. And the board... I'm sorry, please. The board found all the right facts, Your Honor. And then they stopped. They ran into this four-hour thing and they just stopped and they didn't complete the KSR analysis. The board correctly found that the product, the characteristics of the product described in claims 7 through 12, exist in the prior art. That's Lew. They found that if you heat at one hour for 150 degrees, you'll get a product with all the claimed characteristics. The board also found that the Lawton reference discloses expressly to a person of ordinary skill in the art that you should heat below the melt for precisely the same reason that the 020 patent 20-some years later said, which is if you heat below the melt, we're not concerned about structural integrity or the sort of sloppiness of the item that you're irradiating. So the board got those fact questions correct. But then they stopped. They didn't ask the two KSR questions, which is one, is there any motivation when I've got this Lew product an hour for 150 degrees, is there a motivation for me to go below the melting temperature? Yes. It's not just a motivation. It's an express, unequivocal statement from Lawton to do that. So the board missed that. The board also missed the expectation of success. What a person of ordinary skill in the art who knows that they can get all the claimed properties one hour for 150 degrees, expect that at 130 degrees, you could also get those claimed properties. Of course they would. Why? Well, because all the prior art, many of the prior art references do get that result. And the prior art tells you expressly, Lawton says expressly, how long you must heat, and it's heat until all, substantially all, of the free radicals are gone. Just like the Dole reference, just like the de Boer reference, which go a little bit further, they say get rid of all the free radicals. And as a matter of chemistry, that's what this is all about. Once the free radicals are gone, your claimed properties are, are there any free radicals? No, they're gone. The references tell you that they're gone. Will this oxidize when we age it? No, because all the free radicals are gone. What happened to those free radicals? Lawton tells you expressly what happened to those free radicals. They all hooked back up with one another to form cross-links, which improves the, improves the resistance of the material to dissolving in a solvent. So the person of ordinary skill in the art could almost, we know they're not an automaton, we know in KSR that they have ordinary creativity, but they could almost be an automaton and say one hour, 150 degrees, am I incented to go below the melt? Yes, Lawton tells me exactly to do that. Do I expect that I will be successful in doing that? Yes, of course I do. And again, for the very same reason that HowMedica offered to the patent office to get these patents in the first place, the general rule, where HowMedica said every 10 degrees you go down you can expect to double the heating time and vice versa. So a person of ordinary skill in the art... I take it the board did not really buy into the general rule. They didn't, but the reason they didn't, Your Honor, is express and it's clear. They said, we think the general rule is just a litigation argument. So we're going to feel free to disregard a litigation argument that HowMedica, which lost on the first three patents below, in an opinion this court affirmed, we're going to disregard that argument. But they were wrong, it wasn't a litigation argument. It was an argument that exists in the intrinsic record of this patent. And it was the reason that HowMedica was able to get each of the predecessor patents because the patent office said, wait a second. It looks to us that Stryker anticipates. Stryker has got the same process conditions or an equivalent process condition to 50 degrees at 144 C. HowMedica said, no, no. You've got to apply the general rule and when you apply the general rule you see that Stryker is just the other side of the process conditions, the total time, temperature, heating combination that we've got. I'm into my rebuttal time, so I'll stop there unless you have other questions, Your Honor. Now, you have rebuttal time? Do you have a cross appeal? We do have a cross appeal, Your Honor. I believe we set ours at 10 and 5. Well, let me just, if I could, really quickly, could you tell me what your takeaway from Cattivo's testimony is? Mr. Malloy has suggested that Cattivo came up with five possibilities of what the starting material could be. What's your read of his deposition? I don't think the record reflects that, Your Honor. If I could, I'd just refer, Your Honor, to the record. Cattivo said there's only two options. There's 640 through 656. That's right. He talks, he's not the clearest witness in the world. I think we can all agree on that. The question is, when he gets beyond GUR 4130 and GUR 4030, I want to see what you think he's saying with the other products that he refers to. He talks about the, go ahead. Our view, Your Honor, is that the only two possible products that he talks about in any real sense is 4030 and 4032. And that we got one of each of those and we tested them, but at the end of the day, we shouldn't be faulted for having done substantially more than we needed to do because the record that the examiner and the board considered reflects strongly that there, it doesn't make a difference what kind of ultra-high molecular weight polyethylene you use. And that is, in fact, the test for inherency, that it shouldn't make a difference what kind you use. And the record reflects that fact, Your Honor. Okay. Thank you, Mr. Callahan. Thank you, Your Honor. Mr. Molloy. To Cotevo first. That was the last taken up. Cotevo said at appendix page 641 to 642 that there was ultra-high. Then he testified about blended with carbon fillers. Then he testified about... That blended with carbon fillers, where is that? That's at 641 to 642, appendix page. At the same set of pages, he then testified about blended with other things. I can get the line. I have it. All right. And then he testified that blended with PTFE at 641 and 2. And finally... Those are things that are not purely UMW... UHMWPE. They are. They're ultra-high molecular weight polyethylene options. But blended with other things. Exactly right. But nobody knows what Lew reported on. And they were all available. The way Lew expressed it, he bought UHMWPE, not some blend, right? No, he never said not some blend. He just said, I got whatever I got. And he also said that he had two different materials and he didn't know why. And he described them as having different structures and different results. And he had no clue why. And it wasn't the 4130 versus 4030, because Kativo started out saying it was 4030. And then he said, oh, I heard from my production folks. I was dead wrong. We don't know who these people are. It's 4131. Take my word for it. And we have no documentation to support whether he was right the first time, right the second time, or wrong both times. But we do know that he went on to testify that all these different alternatives, and there was one more, by the way, Your Honor, the one was resins from other suppliers that they then resold. And that's at, I believe, appendix page 660. So that's the fifth alternative. So we've got plain UH. We've got two different types of blends. Then we've got blended with other materials. And then we've got resin from other suppliers, which they then made up and then resold to customers. And this record is completely silent on which of those were involved. Completely silent. So Kativo capped it off by saying he had no personal knowledge of these things in any event. So it's a pretty slippery record on which to base a necessarily present standard. But a couple of comments by my opponent. We have a broad claim versus a narrow one. Not correct. We've got very detailed solubility, free radical, and non-increasing oxidation index portions of these claims, which are nowhere found in the prior art. We've got Lew concluding that, and we heard a lot about Lawton. I almost thought that we weren't talking about an anticipation case here, that it was an obviousness case, but the board only found anticipation. But in any event... I think that was with respect to the cross-appeal. Okay. Okay, do respond to the cross-appeal, the obviousness. We've got his reliance on Lawton, but Lawton dealt with high density, and Lew says that high density is a, quote, completely different material than ultra-high when we're talking about the properties. And if the court wishes, that's at A125, appendix page 125. So in terms of the cross-appeal, this was a brand-new argument in terms of claim construction that we ought to now ignore the term annealed. Zimmer has first stopped from making that argument because they made it at the district court. They said annealed counts, and they won a summary judgment of non-infringement. They've waived the argument. It's nowhere made in their re-examination petition. They say, well, please look at footnote 10 of one of our supplemental papers where we say if the board were to find annealed didn't mean anything, then here's the result. But they never cited a case or told the board in their re-exam petition that the board had to ignore the term annealed. And the board properly interpreted it, consistent with the examiner, as requiring heating below the melt. That was the reason why the board didn't discuss obviousness? They dealt with the claims 7 to 12 in detail in obviousness. But as to claims 1 to 6, there was no position ever made that was argued in terms of the board decisions about obviousness. There was one and only one issue that we're here for, which is, is our claims 1 to 6 anticipated by inherency by lieu? So 7 to 12 that they dealt with the obviousness on, 1 to 6 was really an anticipation. We did hear a little bit... They said they waived their objection to the process limitation because they didn't raise it for the board. And to the extent that they raised it, they raised it in a different context from the way they raised it. I don't even think we could say they raised it. They just said, if we were to ignore a kneel. But they never said, yeah, you have to ignore it, cite it in the case or explain why it ought to be ignored. And I would say also... So just to be clear, you're saying it's 7 to 12 and the obviousness, the cross appeal, is not a proper procedure? Well, it's a proper procedure for them to argue, but it's not proper for them to invent a new argument that wasn't presented in their petition for reexamination. And regarding the term annealed, which is in Claim 7 to 12, they have invented a new argument. And it's not explained. No word did they tell the patent office in their reexam filing, you must ignore annealed for the following reasons. But that's only one of the arguments they make on the cross appeal. Well, it's a critical one. I mean, they could lose on that and still win on the cross appeal, right? You wouldn't agree with them. But they have arguments which, if accepted, would lead to their winning on the cross appeal. I would disagree that they should win, even with regard to that. They've got basically a hodgepodge of references that lead nowhere. If we start with Lew, Lew tells us that you probably should not either irradiate or heat because you get severe degradation of properties. He says that at the abstract at page 58 and at the end of his article at page, I think it's 197, I'm referring to the appendix pages. So he leads the way. He says, don't do these things. And then in a burst of hindsight reconstruction, in my view, they say, well, you know, Lawton taught us to heat, but Lawton was only six minutes and it was high density, not ultra high. And Lew says, those are two completely different materials and they behave completely differently. Then we have some heating above the melt, some heating below the melt, some with irradiation, some not with irradiation. And by and large, they really make no basis for reversal of this board's detailed findings. And the fundamental finding of this board on the obviousness of 7 to 12 was that there was no reasonable expectation of success that was established as a matter of fact. When you start out thinking, well, everyone wants to pursue the Holy Grail, but nobody ever got there. And certainly not Lew, who said that the results led to severely adverse properties in both tensile strength and wear resistance and didn't recommend it. And by the way, caused a yellowing of the property. So I thank this court. Any further questions, I'll be happy to entertain. I think we're okay. All right, Your Honor, thank you. I will go with claims 1 through 6 first, try to hit the points there, particularly on some of these issues that have come up on the resin, Your Honor. I'm sorry, Your Honor. You're correct. I'd like you to address the point of waiver. Sure. In our initial reexamination petition, Your Honor, we did say claims 1 through 12 were invalid as anticipated by Lew, by the Lew testing. So that was out there. We did not, I will concede, make the Amgen, In re Thorp version of that argument. But we did say that claims 1 through 12 were anticipated by the inherent disclosures of Lew. So we made that argument that was out there in front of the board right away. Because we had a Markman hearing and because we had a Markman ruling that said claims 7 through 12 are limited to 140 degrees or less, that ended up not going anywhere. Although we did in oral argument raise the in re Thorp argument. We said at A2526 that there is an in re Thorp argument here. And in our briefs, we were, it was indicated that we didn't say anything in our briefs about this, about the waiver issue. We did. I point the court. It sounds like you didn't raise the obviousness argument with respect to 7 through 12. That's right, Your Honor. We did. We raised both anticipation based on Lew and a myriad of obviousness arguments with respect to claims 7 through 12. We raised the in re Amgen or the in re Thorp issue, which is the same as Amgen, product by process. You can't take this product that the PTAB has found existed in the prior art Lew. It's got all the claimed characteristics of claim 7 through 12, but says the patent owner, but we figured out a way to make it at a using a different process, using a lower temperature. That is a matter of law. That's the issue on which the waiver. That's right, Your Honor. Where in your brief did you make that argument? And we didn't make it in our brief to the board. Right. We made it an oral argument to the board. That's too late. Well, Your Honor, we cited the QI press controls case where in a similar situation, this court said, I've got two sets of claims. One of which is, is invalid. We found it invalid. The other of which wasn't found invalid, but all it adds is a process limitation. We can't do that. We don't want to have that inconsistency of result. You requested reconsideration of the board, but I don't see that this was raised even there in the request for reconsideration. We did not make a request for consideration. Well, one of your colleagues... Hamedica made a request for reconsideration. On 1 through 6. That's correct, Your Honor. But in all events, the most important thing here, Your Honors, is that the prior art unequivocally tells you each of the key prior art references that were before the board on claims 7 through 12, whether it's Dole, 83 or 79, DeBoer, Lawton... But you're looking for a combination and obviousness, the Law of Obviousness, right? We are, Your Honor, but we know that the product, we know from Lew, claims 7 through 12, we know that all the characteristics of the claimed products exist in the prior art. Okay, but then, I didn't know who had requested reconsideration, but then you didn't ask the board to issue a decision on obviousness. We did not ask the board to reconsider its determination that there was no obviousness of claims 7 through 12. The board's decision on claims 7 through 12, I don't think there's any question about waiver. We haven't waived our ability to come into this court and argue obviousness of claims 7 through 12. That was fully briefed to the board. That was argued before the board, and the board went the other way. The fact that we didn't seek reconsideration of that determination doesn't prevent us from coming into this court and asking that this court reverse the board's determination of no obviousness of claims 7 through 12. So the waiver just goes to the issue of the process. Only to the Amgen-Inre Thorpe issue, Your Honor. Only. And as, if I can conclude, as to that, all of the prior art references, we know we can make this at a higher temperature. The only question is can we make it at a lower temperature? And we see the prior art again and again and again saying you can, and telling you in terms of the length of time you need to heat it, we know you have to heat it for a longer time. Lower temperature, longer time. Every person of ordinary skill in the art, if they know one thing, they know that. Each of the references that was cited to the board provides an end point. Heat it until all of the free radicals are gone. And once all those free radicals are gone, you will have all the claim properties because they relate to getting rid of free radicals. I thank the court for your time and attention this morning. Thank you. Thank you. Thank you both. The case is taken under submission. All rise.